**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.: 08-CV-00273-REB-KLM

INNOVATIER, INC.,

Plaintiff/Counterclaim Defendant,

v.

CARDXX, INC.,

Defendant/Counterclaimant,

v.

ROBERT SINGLETON,

Additional Counterclaim Defendant.

---

# PLAINTIFF'S FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

---

Plaintiff, Innovatier, Inc. ("Innovatier"), states the following in support of its First Amended Complaint for Damages and Demand for Jury Trial against Defendant, CardXX, Inc. ("CardXX"):

## THE PARTIES

1. Innovatier is a Florida corporation with its principal place of business located in Lakeland, Florida.



**EXHIBIT A**

2. CardXX is a Nevada corporation with its principal place of business located in Englewood, Colorado.

3. Additional Counterclaim Defendant, Robert Singleton ("Bob"), is an individual residing in Plant City, Florida. Bob is and has been, at all relevant times, Innovatier's president.

## JURISDICTION AND VENUE

4. The plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of costs, interest and attorneys' fees. Therefore, this Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 1441.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(a)(1) and 1391(a)(3), as CardXX resides and is subject to personal jurisdiction in this district.

## FACTS

### I. INNOVATIER: THE BEGINNING.

6. As a veteran in the packaging industry, Bob knew that there was a long-felt need for a financial transaction card that contained powered electronic components. Although many companies had attempted to develop a manufacturing process to produce financial transaction cards with embedded/encapsulated electronics ("Financial Transaction Cards"), none had perfected a scalable process that was capable of producing a commercially acceptable end product.

7. In 2002, as part of his responsibilities as President of Solicore, Inc., Bob began to study the processes for making Financial Transaction Cards more intently. During this time, Bob spoke with many packaging industry insiders who explained that, even though the separate components to make Financial Transaction Cards existed, no one had invented a manufacturing process that could produce Financial Transaction Cards that was inexpensive, free of defects, and aesthetically pleasing enough to be commercially successful.

8. More specifically, there were significant problems in creating a functional end-product because the electronic components were often destroyed in the manufacturing process. Moreover, even if the electronics survived, the resulting surface finish was not commercially acceptable because it was uneven or bumpy. Also, the materials used in the process were expensive, and there was no known method that could make the process scalable.

9. In the spring of 2004, while still employed at Solicore, Bob received a call from Paul Meyer ("Meyer"), Director of Engineering at CardXX. Meyer informed Bob that CardXX was seeking to license its purported RAMP Technology[1] for manufacturing functional, commercially viable Financial Transaction Cards.

10. In May of 2004, Bob and Solicore CEO, David Corey ("Corey"), met with CardXX and toured CardXX's physical operations in Englewood, Colorado.

[1] By using the term "RAMP Technology," Innovatier does not mean to imply that CardXX's process was a trade secret or that it worked; rather, Innovatier uses this term simply for convenience to refer to CardXX's purported process for making financial transaction cards.

11. Subsequently, Corey determined that Solicore was not interested in the Financial Transaction Card opportunity and bowed out on behalf of Solicore.

12. After further researching the idea of producing Financial Transaction Cards, and additional telephone conversations with Meyer, Bob remained interested in the Financial Transaction Card business opportunity.

13. Shortly thereafter, Bob left Solicore to pursue the Financial Transaction Card opportunity. After discussions with longtime colleague Lawrence Keim ("Larry"), on June 28, 2004, Innovatier was incorporated to develop a new technology that would make Innovatier the worldwide leader in providing packaging alternatives for the manufacture and distribution of Financial Transaction Cards.

## II. INNOVATIER LICENSES THE RAMP TECHNOLOGY.

14. As of July 13, 2004, Innovatier and CardXX entered into a Mutual Non Disclosure Agreement (the "MNDA") and furthered their discussions relating to the RAMP Technology. *A true and correct copy of the MNDA is attached hereto as* ***Exhibit 1.***

15. Beginning with their first communication even prior to the execution of the MNDA, and in virtually all communications leading up to the execution of the Option Agreement, Cardxx represented that its RAMP Technology could produce, on a mass scale, Financial Transaction Cards for Innovatier that would be commercially acceptable.

16. Reasonably relying on this representation, Innovatier and CardXX began negotiating a business relationship in which CardXX would license its RAMP Technology, for

Innovatier's exclusive use, to produce Financial Transaction Cards for VISA and/or MasterCard logos, all cards issued by American Express, Discover, Diners Club and Carte Blanche and on a non-exclusive basis, the right to produce any and all other cards.

17. During these negotiations, CardXX requested Innovatier pay a large up-front license fee.

18. In or around September 2004, Bob and Larry determined that it was not in Innovatier's best interests to pay a large up-front license fee until there was definitive proof that the RAMP Technology worked. Accordingly, Innovatier proposed that CardXX grant Innovatier an option to enter into a license agreement, which would give CardXX an opportunity to show that the RAMP Technology would be capable of producing commercially acceptable Financial Transaction Cards on a mass scale in accordance with the representations that CardXX was making.

19. After months of negotiations, on or about November 8, 2004, the parties executed an Option Agreement (the "Option Agreement"), along with a corresponding License Agreement (the "License Agreement') and Escrow Agreement (the "Escrow Agreement"), that gave Innovatier the right to enter into an exclusive License Agreement if the RAMP Technology proved workable according to the standards contained in the agreements. *True and correct copies of the Option Agreement, License Agreement, and Escrow Agreement are attached hereto as **Exhibits 2, 3, and 4, respectively**.*

20. The Option Agreement provided that on or before March 31, 2005, Innovatier had the option to enter into the License Agreement by providing notice to CardXX and placing

$500,000 in escrow (the "Escrowed Funds"). According to the Escrow Agreement, the Escrowed Funds were only to be disbursed when the escrow agent was notified that "[CardXX] has delivered and [Innovatier] has accepted a manufacturing line that has a minimum manufacturing capacity of 400,000 units per month."

21. As the deadline for exercising the Option Agreement approached, CardXX had not come close to demonstrating that the RAMP Technology could produce a single commercially acceptable Financial Transaction Card, much less the 400,000 units per month required under the License Agreement. Accordingly, Innovatier requested that CardXX extend the deadline in the Option Agreement a few more months.

22. CardXX refused to extend the deadline unless Innovatier agreed to pay $50,000 for the extension; pay $500,000 to CardXX at the time of exercise; increase the minimum annual royalty from $250,000 to $500,000; and reimburse CardXX for the cost of developing certain machinery related to the CardXX Technology.

23. Of course, Innovatier rejected such onerous terms and ultimately exercised its option under the Option Agreement and placed $500,000 in escrow. By exercising the Option Agreement, Innovatier and CardXX entered into the License Agreement.

## III. INNOVATIER DEVELOPS ITS OWN TECHNOLOGY.

24. Given the consistent failure of RAMP Technology to ever produce commercially acceptable Financial Transaction Cards, Innovatier continued its independent development of its

own technology to create a Financial Transaction Card using a process known as reaction injection molding ("RIM")[2].

25. Upon information and belief, unbeknownst to Innovatier, CardXX knew prior to the parties entering into the Option Agreement that the RAMP Technology was a complete failure and that it would never be capable of producing commercially acceptable Financial Transaction Cards, much less 400,000 units per month.

26. Instead, CardXX persisted with its scheme of misrepresentations in order to induce the execution of the Option Agreement and the deposit of $500,000 into escrow.

27. Moreover, CardXX persisted with its scheme of misrepresentations because it knew that Innovatier had generated serious interest from major customers, and that Bob was working on an independent path to producing Financial Transaction Cards using RIM. Upon information and belief, CardXX, in addition to obtaining a $500,000 license fee for doing nothing, desired to misappropriate Innovatier's independently developed process.

[2] Reaction injection molding is a packaging process that has been in use for decades in a variety of industries. The process uses thermoset polymers (commonly polyurethane) instead of thermoplastic polymers used in standard injection molding. Simply put, two components are mixed which react in the mold to form a solid thermoset polymer. Polyurethanes and polyureas are made by reacting together liquid components known as isocyantes, polyols, and polyamines. In recent years the RIM process has become associated with solid elastomeric parts made from polyurethane or polyurea. The main applications of RIM have been in the automotive industry, however, specialty applications, such as electrical encapsulation, have existed since the 1980's.

28. As Innovatier continued to generate customer interest, CardXX began to regret its decision to enter into the exclusive License Agreement. Thus, CardXX undertook a campaign designed to wrongfully recapture intellectual property duly licensed to Innovatier and to wrongfully misappropriate Innovatier's patentable inventions.

## IV. CARDXX GETS DESPERATE.

29. From the day he formed Innovatier, Bob began developing his own technology relating to Financial Transaction Cards and other Powered Cards independently.

30. In fact, in or about September 2004, Bob completed the development of certain technology related to Powered Cards for which Innovatier filed patent application serial number 11/099,477 (the "'477 Application"). The '477 Application was allowed and ultimately matured into U.S. Pat. No. 7,237,724 (the "'724 Patent").

31. Upon information and belief, CardXX was aware that Bob was developing his own technology, separate and apart from his work with CardXX, and wrongfully sought to misappropriate it by surreptitiously filing a patent application covering Bob's inventions without his or Innovatier's consent. In doing so, CardXX knowingly, willfully and intentionally sought to deprive Bob and Innovatier of their rights to the independent invention.

32. Then, in another attempt to deprive Innovatier of the full scope of its rights under the License Agreement, on or about June 15, 2005, CardXX informed Innovatier that it had entered into a "Master License Agreement" (the "Red Bank License") with Red Bank Capital that restricted the scope of the Innovatier License Agreement by awarding Red Bank exclusive

rights to the RAMP Technology except for the exclusive rights that were awarded Innovatier under its Licensing Agreement. Under further investigation, it was determined that CardXX's outside management consultant, Joe Turchyn, was a principal at Redbank Capital, a small-cap investment funding boutique.

33. CardXX also interposed itself between Innovatier and its current and potential customers in an attempt to usurp Financial Transaction Card manufacturing/sales opportunities that rightfully belonged to Innovatier pursuant to the License Agreement.

34. Innovatier demanded explanations from CardXX concerning its inappropriate behavior, but none were forthcoming.

35. Finally, realizing that Innovatier was catching on to its scheme, in or about July 2005 (approximately four months after initiation of the License Agreement), CardXX, abruptly and without cause or justification, banished Innovatier from its operations in Colorado, and on or about October 3, 2007, CardXX wrongfully terminated the License Agreement. This action soon followed.

## COUNT I
## BREACH OF LICENSE AGREEMENT

36. Innovatier re-alleges the allegations set forth in paragraphs 1 through 35 as if fully set forth herein.

37. Innovatier and CardXX entered into the License Agreement on or about March 28, 2005, which was the date that Innovatier exercised its rights under the Option Agreement.

38. Pursuant to Article VIII of the License Agreement, CardXX was obligated to provide a technology that was sufficient to meet Innovatier's intended uses.

39. Specifically, CardXX represented that the RAMP Technology was "sufficient and adequate for and capable of accomplishing the technical objectives prescribed herein or otherwise represented in writing by CARDXX to Licensee." (License Agreement, ¶ 8.3).

40. CardXX failed to provide such technology, thereby breaching the License Agreement.

41. Further, CardXX breached the License Agreement by (a) wrongfully purporting to terminate the License Agreement without cause or justification; (b) refusing to perform under the License Agreement after July 2005; (c) failing to use its best efforts to protect the license; (d) filing at least one patent on technology developed by Innovatier; (e) selling Innovatier's rights under the License Agreement to other third parties; and (f) failing to release the $500,000 of escrow funds to Innovatier.

42. As a result of CardXX's breach of the License Agreement, Innovatier has been damaged.

WHEREFORE, Innovatier requests that judgment be entered in its favor and against CardXX for money damages in an amount to be determined at trial, prejudgment and post judgment interest, costs, and any other relief that this Court deems just and proper.

## COUNT II
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
## (LICENSE AGREEMENT)

43. Innovatier re-alleges the allegations set forth in paragraphs 1 through 42 as if fully set forth herein.

44. CardXX and Innovatier entered into the Option Agreement to enter into a licensing arrangement relating to the RAMP technology. On or about March 28, 2005, Innovatier exercised its rights under the Option Agreement and thereby entered into the Licensing Agreement with CardXX.

45. Pursuant to Article V of the License Agreement, CardXX agreed to "jointly develop the RAMP Proprietary Technology so that it can be adapted . . . to meet the standards required to produce Financial Transactions Cards that will be compliant to ISO standards and/or acceptance by the financial transaction industry." License Agreement, ¶ 5.1

46. In breach of the implied covenant of good faith and fair dealing, however, CardXX deliberately and wrongfully refused to continue working with Innovatier to complete such joint development.

47. CardXX's deliberate and wrongful refusal to complete the project frustrated the purpose of the License Agreement and deprived Innovatier the benefit of the License Agreement.

48. Therefore, as a result of CardXX's deliberate and wrongful breach of the implied covenant of good faith and fair dealing, Innovatier has suffered damages.

WHEREFORE, Innovatier requests that judgment be entered in its favor and against CardXX for money damages in an amount to be determined at trial, prejudgment and post judgment interest, costs, and any other relief that this Court deems just and proper.

## COUNT III
## BREACH OF MUTUAL NON-DISCLOSURE AGREEMENT
## (INJUNCTIVE RELIEF)

49. Innovatier re-alleges the allegations set forth in paragraphs 1 through 48 as if fully set forth herein.

50. As of July 13, 2004, CardXX and Innovatier entered into the MNDA.

51. Pursuant to the MNDA, the parties were, among other things, prohibited from disclosing the nature of the parties' relationship.

52. CardXX breached the MNDA by disclosing the nature of the parties' relationship and the terms of the License Agreement (a) in a September 2004 press release; (b) in correspondence sent to Bob's former employer, Solicore; and (c) to various third parties, including, upon information and belief, Identita CEO, Rocky Stephano.

53. Due to the unique nature of the information contained in the License Agreement, Innovatier has suffered and will suffer irreparable harm should CardXX not be enjoined from further violations of the MNDA.

54. Due to the unique nature of the information contained in the License Agreement, Innovatier has no adequate remedy at law for CardXX's breach of the MNDA.

WHEREFORE, Innovatier requests that judgment be entered in its favor and against CardXX for a mandatory injunction for specific performance of the MNDA, prohibiting CardXX from disclosing the terms of the MNDA to third parties, costs of this action, and any other relief that this Court deems just and proper.

## COUNT IV
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
## (MNDA)

55. Innovatier re-alleges the allegations set forth in paragraphs 1 through 54 as if fully set forth herein.

56. As of July 13, 2004, CardXX and Innovatier entered into the MNDA.

57. Pursuant to the MNDA, the parties were, among other things, prohibited from disclosing the nature of the parties' relationship.

58. Further, CardXX even published a press release on or about September 20, 2004, containing the substance of the License Agreement.

59. In breach of the implied covenant of good faith and fair dealing, however, CardXX deliberately and wrongfully disclosed the nature of the parties' relationship and the terms of the License Agreement to numerous third parties on many occasions.

60. Innovatier has been irreparably damaged by CardXX's breach of the implied covenant of good faith and fair dealing applicable to the MNDA.

WHEREFORE, Innovatier requests that judgment be entered in its favor and against CardXX restraining CardXX from further breaching the MNDA, costs of this action, and any other relief that this Court deems just and proper.

## COUNT V
## DECLARATION OF INVALIDITY AND UNENFORCEABILITY OF U.S. PAT. NO. 7,225,537 B2 DUE TO INEQUITABLE CONDUCT

61. Innovatier re-alleges the allegations set forth in paragraphs 1 through 60 as if fully set forth herein.

62. On or about January 27, 2005, CardXX filed U.S. Patent Application Serial No. 11/044,329 (the "'329 Application") entitled Method for Making Memory Cards and Similar Devices Using Isotropic Thermoset Materials With High Quality Exterior Surfaces.

63. On or about June 5, 2007, U.S. Pat. No. 7,225,537 B2 (the "'537 Patent") issued from the '329 Application.

64. CardXX employee Paul Reed ("Reed") was the only named inventor on the '329 Application and the '537 Patent.

65. On or about June 22, 2005, Reed filed an Oath and Declaration and Power of Attorney (the "Inventor's Oath") with the United States Patent & Trademark Office declaring that he was the sole inventor of the subject matter in the '329 Application and acknowledging his duty to disclose all information material to patentability of the '329 Application.

66. Upon information and belief, Reed made absolutely no contribution whatsoever to the subject matter of the '537 Patent—or any other CardXX patent. Upon information and belief,

Harry Tiffany and Paul Meyer made material contributions to the subject matter of the '537 Patent.

67. In fact, upon information and belief, Reed was rarely at the CardXX facilities and was never involved in any research and development activities at all.

68. Upon information and belief, Reed only received information about CardXX's technological developments through other CardXX executives and it was CardXX's business practice to have Reed draft the patent disclosures and name himself as the inventor. Reed willfully, knowingly and with the intent to deceive signed the Inventor's Oath knowing that he was not the inventor of the subject matter of the '537 Patent.

WHEREFORE, Innovatier requests that this Court enter a judgment declaring the '537 Patent unenforceable, void and invalid for CardXX and Reed obtained the '537 Patent through fraud and inequitable conduct. Innovatier reserves the right to amend this claim in the event any other CardXX patent applications are granted and issued as patents.

## COUNT VI
## BREACH OF MUTUAL NON-DISCLOSURE AGREEMENT
## (DAMAGES)

69. Innovatier re-alleges the allegations set forth in paragraphs 1 through 68 as if fully set forth herein.

70. On or about July 13, 2004, Innovatier and CardXX entered into a Mutual Non Disclosure Agreement (the "MNDA") that specifically precluded CardXX from disclosing Innovatier's confidential information. Further, the MNDA prohibited either party from disclosing the terms of the MNDA and even the fact or existence of the MNDA.

71. After Innovatier and CardXX executed the MNDA, Bob entered into an ongoing series of discussions with CardXX employees relating to the technology at issue in this case. Throughout these discussions, Bob conveyed proprietary, trade secret and confidential technical details ("Innovatier's Proprietary Trade Secrets") of the ongoing, independent research and development activities he was conducting at Innovatier.

72. Innovatier's Proprietary Trade Secrets relate to scientific and technological designs, processes and procedures relating to manufacturing powered cards with embedded/encapsulated electronics.

73. CardXX knew when it entered into the MNDA that it was under a duty to (a) hold Innovatier's Proprietary Trade Secrets in strictest confidence; (b) refrain from using Innovatier's Proprietary Trade Secrets for its own benefit; and (c) refrain from disclosing the terms of or existence of the MNDA.

74. Nevertheless, in bad faith and with malicious intent to harm Innovatier, CardXX breached the MNDA by (a) disclosing the existence of the MNDA and terms thereof in a press release issued in September 2004; (b) disclosing the existence of the MNDA and terms thereof to numerous third parties, including without limitation, upon information and belief, Identita CEO, Rocky Stephano; (c) directing confidential correspondence containing a draft of the license agreement to Bob's former employer, Solicore; and (d) wrongfully disclosing Innovatier's Proprietary Trade Secrets in a Patent Cooperation Treaty patent application, PCT/US2005/009649 (the "'649 Application") titled "Method for Making Advanced Smart Cards

With Integrated Electronics Using Isotropic Thermoset Adhesive Materials With High Quality Exterior Surfaces."

75. Innovatier has suffered damage by CardXX's disclosure of the Trade Secrets and Confidential Information by filing of the '649 Application, because it has deprived Innovatier of the right to its intellectual property and the corresponding competitive advantage, destroyed Innovatier's Proprietary Trade Secrets, and deprived Innovatier of the economic benefit of Innovatier's Proprietary Trade Secrets.

WHEREFORE, Innovatier respectfully requests that this Court enter a judgment in its favor and against CardXX for monetary damages in an amount to be determined at trial and such other relief as the Court deems equitable, just and proper.

## COUNT VII
## FRAUDULENT INDUCEMENT

76. Innovatier re-alleges the allegations set forth in paragraphs 1 through 75 as if fully set forth herein.

77. Prior to Innovatier entering into the Mutual Non-Disclosure Agreement, Option Agreement and License Agreement, CardXX represented that its RAMP Technology could, in fact, produce a commercially acceptable Financial Transaction Card.

78. At the time it made this representation, CardXX knew it was objectively false.

79. CardXX made this representation knowingly, intentionally and with the specific intent to induce Innovatier to enter into the Mutual Non-Disclosure Agreement, Option Agreement and the License Agreement and to induce Innovatier to place $500,000 in escrow.

80. Reasonably relying on CardXX's misrepresentations, Innovatier entered the Option Agreement and License Agreement and placed $500,000 in escrow.

81. As a result of CardXX's fraud, Innovatier has suffered damages.

WHEREFORE, Innovatier requests that judgment be entered in its favor and against CardXX for money damages in an amount to be determined at trial, prejudgment and post judgment interest, attorneys' fees and costs, and any other relief that this Court deems just and proper.

## COUNT VIII
## NEGLIGENT MISREPRESENTATION

82. Innovatier re-alleges the allegations set forth in paragraphs 1 through 81 as if fully set forth herein.

83. Prior to Innovatier entering into the Mutual Non-Disclosure Agreement, Option Agreement and License Agreement, CardXX represented that its RAMP Technology could, in fact, produce commercially acceptable Financial Transaction Cards.

84. At the time it made this representation, CardXX should have known it was objectively false.

85. CardXX made this representation negligently, with the specific intent to induce Innovatier to enter the Option Agreement and the License Agreement and to induce Innovatier to place $500,000 in escrow.

86. Reasonably relying on CardXX's misrepresentations, Innovatier entered the Option Agreement and License Agreement and placed $500,000 in escrow.

87. As a result of CardXX's negligent misrepresentations, Innovatier has suffered damages.

WHEREFORE, Innovatier requests that judgment be entered in its favor and against CardXX for money damages in an amount to be determined at trial, prejudgment and post judgment interest, costs, and any other relief that this Court deems just and proper.

## COUNT IX
## SPECIFIC PERFORMANCE OF LICENSE AND ESCROW AGREEMENTS

88. Innovatier re-alleges the allegations set forth in paragraphs 1 through 87 as if fully set forth herein.

89. Innovatier and CardXX entered into the License Agreement on or about March 28, 2005, and Innovatier deposited $500,000 pursuant to the terms of the License and Escrow Agreements.

90. On October 3, 2007, CardXX notified Innovatier of its intent to terminate the License Agreement.

91. Further, also on October 3, 2007, CardXX published a press release stating that Identita Technologies International SRL was now the sole and exclusive licensee of the RAMP Technology.

92. CardXX's purported termination of the License Agreement was wrongful and unjustified and has caused damage to Innovatier.

93. By virtue of CardXX's failure to perform under the License Agreement (by producing a process using RAMP Technology that could manufacture 400,000 Financial Transaction Cards per month), and by purporting to terminate the License Agreement, Innovatier is entitled to the immediate return of the $500,000 escrow deposit.

WHEREFORE, Innovatier requests that judgment be entered in its favor and against CardXX for the immediate return of the $500,000 escrow deposit, costs, and any other relief that this Court deems just and proper.

**COUNT X**
**MISAPPROPRIATION OF TRADE SECRETS**
**(VIOLATION OF § 7-74-101, ET SEQ, C.R.S.)**

94. Innovatier re-alleges the allegations set forth in paragraphs 1 through 93 as if fully set forth herein.

95. Long prior to ever coming into contact with CardXX, Bob began his research and development activities with the intent to invent a new manufacturing process for making a commercially viable Financial Transaction Cards and other powered cards with embedded/encapsulated electronics.

96. Bob's research activities resulted in the development of Innovatier's proprietary, trade secret and confidential technical information ("Innovatier's Proprietary Trade Secrets") that related to scientific and technological designs, processes and procedures for manufacturing

commercially viable Financial Transaction Cards and other powered cards with embedded/encapsulated electronics.

97. Both Bob and Innovatier took measures to guard Innovatier's Proprietary Trade Secrets, including among other things, use of non-disclosure agreements with employees, independent contractors, and every person or entity doing business of any kind with Innovatier.

98. On or about July 13, 2004, Innovatier and CardXX entered into a Mutual Non Disclosure Agreement (the "MNDA") that specifically precluded CardXX from disclosing or using Innovatier's Proprietary Trade Secrets.

99. After Innovatier and CardXX executed the MNDA, Bob entered into an ongoing series of discussions with CardXX employees relating to the technology at issue in this case. Throughout these discussions, Bob conveyed the confidential technical details of Innovatier's Proprietary Trade Secrets that were the result of Bob's ongoing, independent research and development activities at Innovatier.

100. Innovatier's Proprietary Trade Secrets relate to the scientific and technological designs, processes and procedures for manufacturing commercially viable Financial Transaction Cards and other powered cards with embedded/encapsulated electronics that Bob invented.

101. CardXX knew when it entered into the MNDA that it was under a duty to (a) hold Innovatier's Proprietary Trade Secrets in strictest confidence; (b) refrain from using Innovatier's Proprietary Trade Secrets for its own benefit; and (c) refrain from disclosing the terms of or existence of the MNDA.

102. Nevertheless, CardXX fraudulently, maliciously and with willful and wanton disregard of Innovatier's rights, misappropriated Innovatier's Proprietary Trade Secrets by filing a Patent Cooperation Treaty patent application, PCT/US2005/009649 (the "'649 Application") titled "Method for Making Advanced Smart Cards With Integrated Electronics Using Isotropic Thermoset Adhesive Materials With High Quality Exterior Surfaces" naming CardXX employee Paul Reed as the inventor.

103. Innovatier was, is and continues to be substantially harmed by CardXX's misappropriation, because Innovatier has been deprived of the economic and competitive advantages and rights to its own intellectual property.

WHEREFORE, Innovatier respectfully requests that this Court enter a judgment in its favor and against CardXX for monetary damages in an amount to be determined at trial, disgorgement of CardXX's profits, prejudgment interest, the cost of this action including attorneys' fees and expenses, and any other relief as the Court deems equitable, just and proper.

## COUNT XI
## UNFAIR COMPETITION
## (VIOLATION OF 15 U.S.C. § 1125(A))

104. Innovatier re-alleges the allegations set forth in paragraphs 1 through 103 as if fully set forth herein.

105. Over the course of the parties' relationship, CardXX has repeatedly engaged in activities that unfairly competed with Innovatier.

106. In section 2.1.1 of the License Agreement, CardXX granted to Innovatier a *non-exclusive* license to use CardXX's technology to produce "any and all other cards" in addition to its exclusive license to produce branded Financial Transaction Cards, so long as such production did not interfere with the rights of any other licensee.

107. Long after the execution of the License Agreement, CardXX wrongfully sought to recapture the non-exclusive license it granted to Innovatier by entering into a so-called "Master License Agreement" with RedBank Capital – an investment funding firm owned by CardXX outside management consultant Joseph Turchyn.

108. The Master License Agreement granted an *exclusive* license to RedBank Capital to produce any and all cards other than the branded Financial Transaction Cards exclusively licensed to Innovatier.

109. CardXX has engaged in unfair competition by wrongfully attempting to recapture the rights granted under non-exclusive license granted to Innovatier and transferring those rights to a company owned by CardXX's own management consultant. Upon information and belief, CardXX's license to RedBank Capital was simply an intermediate step in eventually licensing the CardXX technology to Innovatier's competitor, Identita and its CEO, Rocky Stephano.

110. CardXX also unfairly competed with Innovatier by interposing itself between Innovatier and its current and potential customers in an attempt to usurp Financial Transaction Card manufacturing/sales opportunities that rightfully belonged to Innovatier pursuant to the License Agreement.

111. Innovatier developed proprietary, trade secret and confidential technical information ("Innovatier's Proprietary Trade Secrets") that related to scientific and technological designs, processes and procedures for manufacturing commercially viable Financial Transaction Cards and other powered cards with embedded/encapsulated electronics.

112. Innovatier is the rightful and exclusive owner of all right to license, develop, patent, make, use, sell or otherwise exploit Innovatier's Proprietary Trade Secrets.

113. After entering into a Mutual Non Disclosure Agreement (the "MNDA") specifically precluding CardXX from disclosing or using Innovatier's Proprietary Trade Secrets, CardXX breached the MNDA and misappropriated Innovatier's Proprietary Trade Secrets and incorporated them in a Patent Cooperation Treaty patent application, PCT/US2005/009649 (the "'649 Application") titled "Method for Making Advanced Smart Cards With Integrated Electronics Using Isotropic Thermoset Adhesive Materials With High Quality Exterior Surfaces" naming CardXX employee Paul Reed ("Reed") as inventor.

114. Prior to filing, CardXX *knew* that Bob invented the subject matter of the '649 Application; yet CardXX knowingly, fraudulently, willfully, maliciously and with reckless disregard for Innovatier's rights, misappropriated Innovatier's Proprietary Trade Secrets and filed the '649 Patent naming Reed as the inventor. CardXX's misappropriation of Innovatier's Proprietary Trade Secrets was intentional and carried out in callous disregard and with specific intent to deprive Innovatier of its intellectual property rights.

115. By misappropriating Innovatier's Proprietary Trade Secrets and naming its own employee as the inventor of the technology claimed in the '649 Application, CardXX is unfairly

competing with Innovatier by creating confusion among consumers in the marketplace as to the ownership of the subject matter of the '649 Application and the corresponding intellectual property rights thereto.

116. Innovatier was substantially harmed by CardXX's misappropriation and unfair competition as CardXX has deprived Innovatier the rights to and full benefit of the rights granted under the License Agreement, Innovatier's intellectual property and economically beneficial relationships with customers that rightfully belonged to Innovatier pursuant to the License Agreement.

WHEREFORE, Innovatier respectfully requests that this Court enter judgment in its favor and against CardXX for actual damages, an accounting and constructive trust over all profits unlawfully derived from technology misappropriated by CardXX from Innovatier, a permanent injunction restraining CardXX from using any of Innovatier's Proprietary Trade Secrets, assignment of the '649 Application from CardXX to Innovatier, and any other relief as the Court deems equitable, just and proper.

## COUNT XII
## SPECIFIC PERFORMANCE OF LICENSE AGREEMENT
## (ALTERNATIVE COUNT)

117. Innovatier re-alleges the allegations set forth in paragraphs 1 through 116 as if fully set forth herein.

118. CardXX Innovatier and CardXX entered into the License Agreement on or about March 28, 2005, and Innovatier deposited $500,000 pursuant to the terms of the License and Escrow Agreements.

119. Section 2.1.1 of the License Agreement granted Innovatier an exclusive license to use the "CardXX's RAMP Proprietary Technology to manufacture Financial Transaction Cards 'bearing the VISA and/or MasterCard logos and all cards issued by American Express, Discovery, Diner's Club and Carte Blanche[.]'"

120. Additionally, the License Agreement granted Innovatier the non-exclusive right to "produce all other cards as long as the production of said product does not interfere with the rights of any other licensee of the CARDXX RAMP Proprietary Technology."

121. Therefore, if it is determined that Innovatier is using the CardXX technology, Innovatier is entitled to an Order specifically enforcing the terms of the License Agreement, declaring that the purported termination by CardXX was improper and unjustified, and declaring any royalty amounts owed thereunder.

WHEREFORE, in the event that it is determined that Innovatier is using the CardXX technology, Innovatier requests that judgment be entered in its favor and against CardXX specifically enforcing the terms of the License Agreement, declaring that the purported termination by CardXX was improper and unjustified, declaring any royalty amounts owed thereunder, and any other relief that this Court deems just and proper.

## COUNT XIII
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

122. Innovatier re-alleges the allegations set forth in paragraphs 1 through 121 as if fully set forth herein.

123. Innovatier has contractual business relationships with various customers.

124. CardXX has actual knowledge of Innovatier's contractual business relationships with such customers.

125. On or about March 26, 2009 CardXX CEO, Steven Wapelhurst, sent correspondence to Innovatier's customers that was specifically intended to wrongfully interfere with Innovatier's contractual relationships.

126. CardXX's correspondence was intended to cause Innovatier's customers to stop doing business with Innovatier and to cause damage to Innovatier.

127. Innovatier suffered damages as a result of CardXX's wrongful actions.

WHEREFORE, Innovatier requests that judgment be entered in its favor and against CardXX for money damages in an amount to be determined at trial, prejudgment and post judgment interest, costs, and any other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Innovatier demands a trial by jury on all counts triable as such.

Dated this 13th day of November 2009.

*s/ Byeongsook Seo*
Byeongsook Seo
ISAACSON ROSENBAUM PC
1001 17th Street
Suite 1800
Denver, CO 80202
V 303.292.5656
F 303.292.3152
bseo@ir-law.com

Richard Thomas Petitt
BRICKLEMYER, SMOLKER & BOLVES PA
500 E Kennedy Blvd
Suite 200
Tampa, FL 33602
V 813.223.3888
F 813.228.6422
rich@bsbfirm.com

Suzette Marteny
BAYSHORE LAW GROUP PLLC
400 N. Ashley Drive
Suite 2010
Tampa, FL 33602
V 813.225.1100
F 813.225.1108
smarteny@bayshorelawgroup.com

*Attorneys for Innovatier, Inc. and Robert Singleton*

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of November, 2009 a true and correct copy of the foregoing **ANSWER AND AFFIRMATIVE DEFENSES TO SECOND AMENDED COUNTERCLAIMS** was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following addressees:

Jamie T. Brickell
Jonathan T. Shepard
Pryor Cashman, LLP
410 Park Avenue
New York, NY 10022

Johnathan Lane
Frommer Lawrence & Haug LLP
745 fifth Ave
New York, New York 10151

Denis Mark
Waller and Mark P.C.
5105 DTC Parkway, #450
Greenwood Village, CO 80111-2625

Justine Donahue
Frommer Lawrence & Haug LLP
1667 K Street NW
Washington, DC 20006

*s/ Byeongsook Seo*