IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 08-cv-00273-PAB-KLM

INNOVATIER, INC.,

      Plaintiff/Counterclaim Defendant,

v.

CARDXX, INC.,

      Defendant/Counterclaimant,

v.

ROBERT SINGLETON,

      Counterclaim Defendant.

---

**ORDER GRANTING IN PART PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT ON COUNT IX**

---

      This matter is before the Court on Plaintiff Innovatier, Inc.'s ("Innovatier") motion for summary judgment on its claim for specific performance of the parties' escrow agreement and return of the funds in escrow [Docket No. 156]. The motion is fully briefed and ripe for disposition. The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 based on diversity jurisdiction.

**I.     STANDARD OF REVIEW AND THE NONMOVANT'S BURDEN**

      "In diversity cases like this one, . . . [federal courts] are governed by federal law in determining the propriety of . . . summary judgment." *Hill v. Allstate Ins. Co.*, 479 F.3d 735, 739 (10th Cir. 2007) (internal quotations omitted). According to Federal Rule of Civil Procedure 56, a court should grant summary judgment when the "movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986). A movant who bears the burden at trial must submit evidence to establish every essential element of its claim. *In re Ribozyme Pharms., Inc. Sec. Litig.*, 209 F. Supp. 2d 1106, 1111 (D. Colo. 2002).

Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & County of Denver,* 423 F.3d 1192, 1198 (10th Cir. 2005). A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee,* 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*; *see McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).

CardXX, as the nonmoving party, "may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citations omitted). In bringing forward such specific facts, CardXX must specifically admit or deny the asserted material facts set forth by the movant and, for all denials, provide a factual explanation supported by "a **specific reference** to material in the record." Practice Standards (Civil cases), Judge Philip A. Brimmer § III.F.3.b.iv. (emphasis in original). The Court's practice standards explain

2

that "[g]eneral references to . . . depositions, or documents are insufficient if the document is over one page in length" and give examples of how to provide a "specific reference" for various types of evidence, *e.g.*, for depositions, provide page and line numbers. *Id.* at § III.F.3.b.ii. The standards also instruct that any additional disputed questions of fact shall be set forth "in simple, declarative sentences, **separately numbered and paragraphed**." Id. at § III.F.3.b.v. (emphasis in original).

Innovatier contends that CardXX did not comply with these standards in setting forth its denials and additional statements of fact. Specifically, Innovatier challenges CardXX's failure to specifically reference the supporting material in the record and to set forth its assertions in separate, simple, declarative sentences.

Addressing Innovatier's first point, CardXX, in its brief, cites to the materials by exhibit number (*e.g.*, "Ex. 2") without any pinpoint citations. Technically, however, CardXX did provide pinpoint citations in the declaration of Justine Donahue, where she attests to the accuracy of the materials provided. Docket No. 200-1. Nevertheless, Innovatier's point is well taken in that many of the exhibits constitute a compilation of documents that, at times, appear to provide no support for CardXX's assertion. This makes the task of determining whether there is support difficult, particularly when – to Innovatier's second point – CardXX proffers multi-sentence paragraphs with a single citation. *See, e.g.*, Docket No. 200, Def.'s Opp'n at 5, ¶ 3.

To take a simple example, CardXX asserts: "CardXX delivered to Innovatier all of the drawings, specifications, and design elements necessary for Innovatier to install its automated manufacturing line capable of producing 400,000 saleable units per month."

Docket No. 200, Def.'s Opp'n at 4, ¶ i.  In support, CardXX cites to its second amended counterclaim (*i.e.*, a pleading) and "Ex. 2; *see also* Ex. 8."  *Id*.  Exhibit 2 is a 60-page collection of what appears to be 17 separate documents, including deposition transcripts, presentations, emails, spreadsheets, memos, pictures, notebook pages, and diagrams.  Docket Nos. 200-3 and -4.  One of these documents is a spreadsheet entitled "CardXX Estimated 2005 Capital Requirements" with an email from CardXX asking Innovatier if they "see any holes . . . just to get the conversation started."  Docket No. 200-3 at 24-26.  Another is a "Statement of Work" that outlines various tasks and responsibilities.  Docket No. 200-4 at 7-9.  Another is "CardXX-Innovatier Project Plan Outline" that is similar in nature to the "Statement of Work."  *Id.* at 10.  CardXX does not explain how these documents support its assertion.  Apparently, CardXX believes the Court is supposed to connect the dots.  The best the Court can divine from these documents, however, is that the parties were working together to design a manufacturing line, as anticipated by the Licensing Agreement.  Docket No. 156-6, Licensing Agreement at 7, § 5.1.

This example is indicative of CardXX's general approach in responding to the instant motion.  CardXX proffers much evidence (a total of 19 exhibits with only 7 offered in support of its assertions of fact), but fails to connect such evidence to any cogent basis for denying the motion.  This is not a reason to strike CardXX's assertions, as Innovatier requests, but does weaken CardXX's proof.

With that, the Court turns to the factual background of the case.

## II.   BACKGROUND

### A. *Factual Background*

Unless otherwise noted, the following facts are not in dispute:  On or about

March 28, 2005, the parties entered into a license agreement ("License Agreement").

The License Agreement provides:

> Licensee, upon exercise of its Option to enter into the
> License Agreement, will execute an Escrow Agreement
> (Exhibit A), thereby placing $500,000 in escrow, which
> represents a one time License Fee to CARDXX for the world
> wide exclusive right to use the RAMP Proprietary
> Technology in accordance with the terms and conditions of
> this License Agreement. The License Fee will be released to
> CARDXX when the conditions contained in the Escrow
> Agreement are met, said terms to include, but not be limited
> to the delivery of and acceptance by the Licensee of a
> production line capable of producing 400,000 units per
> month.

Docket No. 156-6, License Agreement, at 7, § 4.4.

At about this same time, the parties executed the escrow agreement attached as

Exhibit A to the License Agreement ("Escrow Agreement" or "Agreement"), and

Innovatier deposited $500,000 with the escrow agent.  The Escrow Agreement

provides:

> The Escrow Agent is to release funds to the Company
> [CardXX] as instructed upon receiving written notification
> from the Depositor [Innovatier] that the Company has
> delivered and the Depositor has accepted a manufacturing
> line that has a minimum manufacturing capacity of 400,000
> units per month [(the "Gen2 Line")].

Docket No. 156-8, Escrow Agreement, at 1, § 2(b).  The Escrow Agreement is silent,

however, as to the release of the funds if the required notification is not received.  *Id*.

The parties agree that CardXX terminated the License Agreement, though they dispute the date of such termination.[1]  Prior to CardXX terminating the License Agreement, neither CardXX nor Innovatier notified the escrow agent that CardXX had delivered and Innovatier had accepted a manufacturing line that had a minimum manufacturing capacity of 400,000 units per month.[2]   CardXX has not authorized the escrow agent to return the deposit and accumulated interest thereon to Innovatier.  As a result, the escrow agent continues to hold the deposit of $500,000, plus accumulated interest.

### B.  *Procedural Background*

On October 23, 2007, Innovatier commenced this litigation in Florida state court asserting causes of action for specific performance and damages based in part on the License Agreement.  Docket Nos. 1-1; 1-5.  CardXX removed the action to the United States District Court for the Middle District of Florida on the basis of diversity jurisdiction, and the parties stipulated to a transfer of the case to this Court.  Docket No. 1-1; Docket No. 1, Order, February 1, 2008; Docket No. 1-12.

On February 3, 2009, after the case was transferred to the District of Colorado, Innovatier filed a petition under Chapter 11 of the Bankruptcy Code in the Middle District of Florida.  Docket No. 79.  As a result, the Court administratively closed the

---

[1]  Innovatier claims the License Agreement was terminated on October 3, 2007. Docket No. 156, Pl.'s Mot. Summ. J. at 4.  CardXX claims the Agreement was terminated on or about December 14, 2006.  Docket No. 200, Def.'s Opp'n at 5, ¶ 1.

[2]  Based on the language of the License Agreement, "units" refers to the number of "saleable" Financial Transaction Cards, or cards that meet applicable standards and are acceptable to Innovatier's customers.  *See* Docket No. 156-6, License Agreement at 6, § 4.1.5.

case.  *See* Docket No. 95.  The Court reopened the case on August 5, 2009 pursuant to a lifting of the stay by the Bankruptcy Court.  Docket No. 102.

On January 8, 2010, Innovatier amended the Complaint, adding, *inter alia*, a claim for specific performance of the License and Escrow Agreements (Count IX). Docket No. 145.  On May 21, 2010, Innovatier moved for summary judgment on this claim.  Docket No. 156.

## III.   ANALYSIS

Innovatier moves for summary judgment on its claim for specific performance of the License and Escrow Agreements and requests return of the $500,000 escrow deposit plus accumulated interest.  Docket No. 156, Pl.'s Mot. For Summ. J. at 1; Docket No. 145, Am. Compl. at 19-20, ¶¶ 88-93 (Count IX).  Innovatier contends that CardXX never delivered a manufacturing line capable of producing 400,000 saleable units per month, which is a condition precedent to the release of the escrow funds to CardXX.  Docket No. 156, Pl.'s Mot. Summ. J. at 3, ¶¶ i-j.  As such, and in view of the termination of the License Agreement, Innovatier claims the escrow funds should be returned.  *Id*. at 5-7.  CardXX disputes that it did not deliver the manufacturing line and claims that the terms of the Escrow Agreement regarding release of the escrow funds are ambiguous.

### A.  *Ambiguity of Terms Regarding Release of the Escrow Funds*

CardXX claims the agreements concerning the escrow funds – the License Agreement and the Escrow Agreement – are ambiguous for three reasons: (1) it is not clear from the License and Escrow Agreements what constitutes "delivery" and

"acceptance"; (2) the License Agreement suggests additional conditions may be present for release of the funds; and (3) the $500,000 deposit represents more than consideration for delivery of the manufacturing line, but constitutes, at least in part, a one-time license fee to CardXX.  Docket No. 200, Def.'s Opp'n at 13-15.  For the following reasons, the Court finds that the Agreements are unambiguous.

Both Agreements provide that Nevada law governs their construction.  Docket No. 156-8, Escrow Agreement at 4, § 14; Docket No. 156-6, License Agreement at 16, ¶ 15.1.  Pursuant to the law of Nevada, "[w]hen a contract is clear, unambiguous, and complete, its terms must be given their plain meaning and the contract must be enforced as written; the court may not admit any other evidence of the parties' intent because the contract expresses their intent."  *Ringle v. Bruton*, 86 P.3d 1032, 1039 (Nev. 2004); *see Sandy Valley Assocs. v. Sky Ranch Estates Owners Assoc.*, 35 P.3d 964, 967-68 (Nev. 2001), *abrogated on other grounds by Horgan v. Felton*, 170 P.3d 982 (Nev. 2007).  However, a "contract is ambiguous if it is reasonably susceptible to more than one interpretation."  *Shelton v. Shelton*, 78 P.3d 507, 510 (Nev. 2003).  If a contract is ambiguous, the Court should look beyond its express terms to the circumstances surrounding the parties' agreement and their subsequent conduct to determine their true and mutual intent.  *Id*.  Extraneous evidence, however, cannot be used to explain the meaning of a contract that is unambiguous on its face.  *Kaldi v. Farmers Ins. Exch.*, 21 P.3d 16, 21 (Nev. 2001).  The interpretation of a contract when facts are not in dispute is a question of law.  *Shelton*, 78 P.3d at 510.  The existence of an ambiguity is also a question of law.  *Ins. Co. of N. Am. v. Hilton Hotels U.S.A., Inc.*,

908 F. Supp. 809, 814 (D. Nev. 1995) (citing *Margrave v. Dermody Prop.*, 878 P.2d 291, 293 (Nev. 1994)).

CardXX's first argument is directed to the alleged ambiguity of the terms "delivery" and "acceptance."  Docket No. 200, Def.'s Opp'n at 13.  The entirety of CardXX's argument, however, is dedicated to extrinsic evidence that allegedly demonstrates the parties had not reached an agreement as to the meaning of "acceptance."  *Id.*  This is not sufficient to demonstrate an ambiguity.  Parol evidence cannot be introduced to demonstrate an ambiguity if the contract is unambiguous on its face. *Kaldi v. Farmers Ins. Exch.*, 21 P.3d 16, 21-22 (Nev. 2001).  CardXX has not shown a facial ambiguity.  Ambiguity exists only if the terms are reasonably susceptible to more than one interpretation, and CardXX does not proffer an alternative interpretation to the plain and ordinary meaning of the terms.

Second, CardXX's contention that additional conditions may exist regarding return of the escrow is irrelevant to whether CardXX performed the single condition that both parties agree must be performed, that is, notification of delivery and acceptance of the Gen2 Line.  Assuming additional conditions do exist, the Court need only consider them if CardXX can establish the necessary notification occurred.  *See* Docket No. 205, Pl.'s Reply at 9.

Third, CardXX argues that the Agreements are ambiguous because the $500,000 deposit seems to constitute a one-time license fee.  The fact that the escrow funds may represent a license fee is irrelevant.  The conditions for release of the funds to CardXX remain the same and are clearly provided for in the Escrow Agreement: "upon receiving written notification from [Innovatier] that [CardXX] has delivered and

[Innovatier] has accepted a manufacturing line that has a minimum manufacturing capacity of 400,000 units per month." Docket No. 156-8, Escrow Agreement at 1, § 2(b).

That said, the Agreements are silent as to how the escrow funds should be distributed in the event of non-performance of this condition. Silence, however, does not equate to ambiguity. Under Nevada law, when an escrow agreement does not dictate the circumstances under which the parties can cancel escrow, the right to cancel is dependent upon principles of law. *Goldston v. AMI Investments, Inc.*, 655 P.2d 521, 523-24 (Nev. 1982).

In this regard, the Restatement (Second) of Contracts provides:

> [D]elivery of a sealed promise in escrow or its conditional delivery to the promisee is irrevocable for the time specified by the promisor for the occurrence of the condition, or, if no time is specified, for a reasonable time.

Restatement (Second) of Contracts, § 103(4); 1 *Williston on Contracts*, § 2:9 (4th ed. 2010) ("[I]f the condition does not occur within . . . a reasonable time, both the escrow transaction and the conditional delivery arrangement imply the existence of a power, exercisable by the obligor, to revoke the delivery and recall the deed."). Because the Agreements do not provide a time period for payment of the funds, Innovatier (as the party who placed the funds in escrow) has the power to cancel the escrow if the necessary condition was not performed within a reasonable time. *See Bingham v. Taylor*, 12 F.2d 15, 17 (5th Cir. 1926) ("As his instructions were not complied with in time, he then had the right to cancel the escrow."); *Finley v. Curley*, 774 P.2d 542, 556 (Wash. App. 1989) ("The stock escrow agreement . . . was revocable if the required

10

performance was not received within a reasonable time."); *Henry v. Sharma*, 201 Cal.

Rptr. 478, 480-82 (Cal. App. 1984) (ordering specific performance to buyer when seller

canceled escrow prior to passage of reasonable time for performance).

In the absence of contrary evidence[3], the Court will treat the instant motion as

Innovatier's attempt to cancel the escrow.  This cancellation is only possible if a

reasonable time for performance has passed.  In this regard, the Court notes that the

License Agreement has been terminated and the parties are in the midst of litigation,

thereby precluding future delivery of the Gen2 Line.  Additionally, CardXX does not

allege insufficient time to accomplish such delivery.  Rather, CardXX opposes the

motion on the grounds that a triable issue of fact remains regarding its actual delivery of

the Line.  Based on these facts, the Court will presume that a reasonable time had

passed from the execution of the License Agreement to its termination.  The only issue

left for determination is whether the condition for release of the escrow funds was

performed.

### B. *Non-Performance of the Escrow Condition*

It is undisputed that, prior to the termination of the License Agreement, neither

party notified the escrow agent that CardXX had delivered and Innovatier had accepted

the manufacturing line.  Docket No. 156, Pl.'s Mot. Summ. J. at 3, ¶ k; Docket No. 200,

Def.'s Opp'n at 4, ¶ k.  While this is the literal condition for release of the funds, it is

also worth examining whether CardXX, as it claims, actually delivered the Gen2 Line to

---

[3]    Innovatier claims that it demanded the return of the escrow deposit from
CardXX.    Docket No. 156, Pl.'s Mot. Summ. J. at 3, ¶ l; Docket No. 156-1, Keim Aff. at
4, ¶ 17.   However, it provides no evidence of when it did so, and CardXX disputes that
Innovatier ever made such a demand.  Docket No. 200, Def.'s Opp'n at 4, ¶ l.

Innovatier.

The basis for CardXX's claim that it delivered the Gen2 Line is far from clear. CardXX simply states, "CardXX delivered to Innovatier all of the drawings, specifications, and design elements necessary for Innovatier to install its automated manufacturing line capable of producing 400,000 saleable units per month." *Id*. at 4, ¶ i.  CardXX later asserts it "acted in good faith to deliver an acceptable manufacturing line to Innovatier capable of producing 400,000 units per month, however, CardXX's efforts to deliver the line were continually thwarted by Innovatier's conduct." *Id*. at 5, ¶ 6.

It is not clear from CardXX's response brief how these assertions are relevant to whether CardXX delivered the Gen2 Line.  CardXX does not argue that its drawings, specifications, and design elements constitute the required Gen2 Line, that Innovatier waived CardXX's performance of the condition by accepting a substitute in the form of these drawings, specifications, and design elements, or that CardXX is excused from delivering the Gen2 Line because of prior breaches by Innovatier.  Instead, CardXX cites, without explanation, a collection of disjointed documents.  *See* Exs. 2-3, 6, and 9-19 to Def.'s Opp'n, Docket No. 200.  These failures prevent the Court from assessing the merits of CardXX's arguments.  In order to find that Innovatier is not entitled to return of the escrow funds, the Court needs more.  *Meyer v. Bd. of County Comm'rs*, 482 F.3d 1232, 1242 (10th Cir. 2007) ("[W]e are not charged with making the parties' arguments for them."); *Phillips v. Calhoun*, 956 F.2d 949, 953-54 (10th Cir.1992) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing

12

why it is sound despite a lack of supporting authority or in the face of contrary authority,
forfeits the point.'") (quotation omitted).  Consequently, the Court finds that CardXX has
failed to raise a triable issue of fact that it delivered the Gen2 Line.  Thus, given that the
conditions for payment of the escrow to CardXX have not occurred and a reasonable
amount of time has passed, Innovatier is entitled to have the escrow funds returned to
it.[4]

### C. *Accumulated Interest*

In addition to the return of the escrow funds, Innovatier requests the interest
accumulated thereon.  Docket No. 156, Pl.'s Mot. Summ. J. at 1, 8.  This issue,
however, was not briefed by either party.  Without relevant evidence and argument, the
Court cannot make an appropriate determination.  As a result, supplemental briefing is
necessary.  In this regard, the Court notes that the Escrow Agreement provides that the
funds shall be deposited in an interest bearing account, but it fails to state which party
is entitled to the accrued interest prior to transfer of the escrow funds.  Docket No. 156-
8, Escrow Agreement at 1, § 1.

It is, therefore,

**ORDERED** that Plaintiff-Counterclaim Defendant Innovatier's Motion for
Summary Judgment on Count IX of First Amended Complaint [Docket No. 156] is
GRANTED IN PART.  The Court reserves ruling on the issue of distribution of the
accumulated interest pending supplemental briefing.  It is further

---

[4] It may be that CardXX is entitled to at least a portion of the $500,000 as a
license fee.  However, this is not a sufficient basis to hold the funds in escrow when the
agreed-to release condition cannot be performed.

13

**ORDERED** that the escrow agent is authorized and directed to release the amount of $500,000 to Innovatier, Inc.  It is further

**ORDERED** that the escrow agent shall maintain the interest accrued on the $500,000 escrow deposit in its current interest-bearing account pending further order of this Court.  It is further

**ORDERED** that the parties shall submit simultaneous supplemental briefs concerning the disbursement of the accrued interest by January 7, 2011.  The supplemental briefs shall be limited to the narrow issue of the distribution of the accumulated interest and shall not exceed 5 pages.


DATED December 27, 2010.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge