IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 08-cv-00273-PAB-KLM

INNOVATIER, INC.,

    Plaintiff/Counterclaim Defendant,

v.

CARDXX, INC.,

    Defendant/Counterclaimant,

v.

ROBERT SINGLETON,

    Counterclaim Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ITS FIRST AND SECOND COUNTERCLAIMS**

---

    This matter is before the Court on Defendant/Counterclaimant CardXX's Motion for Summary Judgment on the First and Second Counterclaims of the Second Amended Counterclaim and Jury Demand.  Docket No. 201.  The motion is fully briefed and ripe for disposition.  The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 based on diversity jurisdiction.

**I.    BACKGROUND**

    **A.  *Factual Background***

    Unless otherwise noted, the following facts are not in dispute:  Defendant CardXX, Inc. ("CardXX") has been assigned United States Patent Nos. 5,955,021;

6,025,054; 6,256,873; 6,241,153; and 7,225,537, all of which are valid and existing (the "CardXX Patents"). CardXX also filed U.S. Patent Application Serial No. 11/661,206 on March 23, 2005 entitled "Method for making advanced smart cards with integrated electronics using isotropic thermoset adhesive materials with high quality exterior surfaces" (the "'206 Application"), which has been allowed by the U.S. Patent and Trademark Office ("USPTO"). For purposes of this order, the CardXX Patents and the '206 Application may be referred to collectively as "CardXX Patent Rights."

CardXX and plaintiff Innovatier, Inc. ("Innovatier") entered into a licensing agreement ("License Agreement" or "Agreement") on or about March 28, 2005. The License Agreement provides:

> WHEREAS**:** CARDXX TECHNOLOGY means and includes the following: i) any and all rights in, to, or associated with a certain proprietary chemistry and related processes known as Reaction Assisted Molded Process (**RAMP**) (the "**Proprietary Technology**") or as more fully set forth and described in those certain United States Patent #5,955,021; #6,025,054; #6,256,873; 6,241,153; #726,884; and, #2,289,728, and ii) all know how and technical information possessed by CARDXX and related to the Proprietary Technology; and iii) all patent rights, copyrights, trademarks and other intellectual property rights which are related to the Proprietary Technology including, without limitation, that certain United States Trademark for the mark "CARDXX"; and
>
> WHEREAS: **RAMP Proprietary Technology** means the process that Licensee wishes to incorporate into the manufacturing of Financial Transaction Cards

Docket No. 156-6; License Agreement at 1 (emphasis added). The license grant includes the following:

> CARDXX:  Grants to [Innovatier] the world wide right and

> license to use CARDXX's RAMP Proprietary Technology
> exclusively and limited only to the manufacturing of Financial
> Transaction Cards and sell such products as manufactured
> by said RAMP Proprietary Technology.

*Id*. at 3, § 2.1.1. Additionally, Section 6.1 of the License Agreement states that:

> **Licensee [Innovatier]** acknowledges that the RAMP
> Proprietary Technology is exclusively owned by CARDXX
> and further **agrees that it shall not** challenge CardXX's
> exclusive ownership or otherwise **file at any time** in its
> name, the name of its parent company, subsidiary, or
> affiliate in any country **for any patent**, trademark or
> copyright protection or any official filing or registration
> **relating to RAMP Proprietary Technology without
> CardXX's prior express written consent of such filing**.

*Id*. at 9, § 6.1 (emphasis added).

While the License Agreement was in effect, Innovatier and/or counterclaim defendant Robert Singleton, a founder and officer of Innovatier, filed the following patent applications:

- Patent No. 7,237,724 entitled "Smart card and method for manufacturing a smart card" ("'724 Patent"). Application filed on April 6, 2005 and patent issued on July 3, 2007.

- Patent No. 7,607,249 entitled "RFID bracelet and method for manufacturing a RFID bracelet" ("'249 Patent"). Application filed on July 15, 2005 and patent issued on October 27, 2009.

- Patent Application Serial. No. 11/455,936 entitled "Embedded electronic device and method for manufacturing an embedded electronic device" ("'936 Application"). Application filed on June 20, 2006 and published December 20, 2007.

These applications describe a low temperature/low pressure molding process for making smart cards and other form factors having a top layer and a bottom layer made of polymeric materials between which a core layer of thermosetting polymeric material

is injected (also referred to as a reaction injection molding (RIM) process). The USPTO finally rejected Innovatier's '936 Application citing CardXX's '021 Patent as prior art.

Because of Innovatier's patent application filings, CardXX notified Innovatier by letter dated November 14, 2006 that it believed Innovatier was in breach of Section 6.1 of the License Agreement. Innovatier did not withdraw or abandon any of the Patent Applications and proceeded to file Patent Application No. 11/748,413, entitled "Method for making advanced smart cards with integrated electronics using isotropic thermoset adhesive materials with high quality exterior surfaces" ("'413 Application"). This application is identical to CardXX's '206 Application, and the USPTO finally rejected it based on the '206 Application. For purposes of this order, Innovatier's applications issuing as the '724 and '249 Patents, as well as its '936 and '413 Applications, may be referred to collectively as the "Patent Applications."

### B. *Procedural Background*

On October 23, 2007, Innovatier commenced this action in Florida state court asserting causes of action for specific performance and damages based on the parties' mutual nondisclosure agreement and the License Agreement. Docket No. 1-1; 1-5. CardXX removed the action to the United States District Court for the Middle District of Florida on the basis of diversity jurisdiction, and the parties stipulated to the transfer of the case to this Court. Docket No. 1-1; Docket No. 1, Order, February 1, 2008; Docket No. 1-12.

CardXX answered the complaint and counterclaimed for, *inter alia*, breach of the License Agreement and its attendant implied covenant of good faith and fair dealing. Docket No. 28, Answer and Countercl; Docket No. 47, Am. Countercl.

On February 3, 2009, Innovatier filed a petition under Chapter 11 of the Bankruptcy Code in the Middle District of Florida. Docket No. 79. As a result, CardXX's counterclaims against Innovatier were automatically stayed and the case was administratively closed. *See* Docket No. 95. The Court reopened the case on August 5, 2009 pursuant to a lifting of the stay by the Bankruptcy Court. Docket No. 102. CardXX later filed a second and third amended counterclaim. Docket No.121, Second Am. Countercl.; Docket No. 235, Third Am. Countercl. Through these amendments, CardXX maintained its counterclaims for breach of the License Agreement and its implied covenant of good faith and fair dealing.

Prior to filing its third amended counterclaim, CardXX moved for partial summary judgment on its counterclaims for breach of the License Agreement and breach of the Agreement's implied covenant of good faith and fair dealing. Docket No. 201. While CardXX alleges multiple breaches of the Agreement in the counterclaim, CardXX's motion is directed to the alleged breach of Section 6.1. It is this motion that is currently before the Court.

## II.   ANALYSIS

### A. *Legal Standard - Summary Judgment*

"In diversity cases like this one, . . . [federal courts] are governed by federal law in determining the propriety of . . . summary judgment." *Hill v. Allstate Ins. Co.*, 479 F.3d 735, 739 (10th Cir. 2007) (internal quotations omitted). According to Federal Rule of Civil Procedure 56, a court should grant summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." FED. R. CIV. P. 56(a); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986). A movant who bears the burden at trial must submit evidence to establish every essential element of its claim. *In re Ribozyme Pharms., Inc. v. Sec. Litig.*, 209 F. Supp. 2d 1106, 1111 (D. Colo. 2002). The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see* FED. R. CIV. P. 56(c).

Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & County of Denver,* 423 F.3d 1192, 1198 (10th Cir. 2005). A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee,* 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*; *see McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).

### B. *The License Agreement*

CardXX moves for summary judgment on its first counterclaim for breach of the License Agreement, alleging that Innovatier breached Section 6.1 of the License Agreement when Innovatier filed the Patent Applications without first obtaining CardXX's written consent. Docket No. 201, Def.'s Mot. Summ. J.; Docket No. 235, Third Am. Countercl. at 10-11, ¶¶ 40-47.

It appears to be undisputed that Innovatier's Patent Applications relate to the subject matter of the CardXX Patent Rights and that Innovatier did not receive CardXX's written consent[1] prior to filing the Applications.[2]  The parties' dispute centers on whether the prohibition against unauthorized patent filings related to "RAMP Proprietary Technology" includes a prohibition against unauthorized patent filings related to the subject matter of the CardXX Patents Rights.

CardXX contends that the License Agreement is unambiguous and defines RAMP Proprietary Technology to include the CardXX Patent Rights.  Docket No. 201, Def.'s Mot. Summ. J. at 4, ¶ 5.  Innovatier disagrees and asserts that both Section 6.1 and the term RAMP Proprietary Technology are ambiguous.  As ambiguous provisions,

---

[1] Innovatier disputes that it did not obtain CardXX's written consent, but does so only upon the qualification that it disclosed its intent to file the application for the '724 Patent.  Docket No. 218, Pl.'s Opp'n at 7, ¶ 12.  This qualification is not sufficient to deem this fact disputed.

[2] Innovatier argues CardXX's motion should be denied because the Patent Applications were filed by Mr. Singleton and he is not Innovatier's parent, subsidiary, or affiliate.  Docket No. 218, Pl.'s Opp'n at 16-17.  However, it is well settled that a patent application can only be filed in the names of the individual inventors of the claimed subject matter.  35 U.S.C. §§ 111, 115-16.  The parties likely intended Section 6.1 to extend, at the very least, to all employees or officers of Innovatier who have an obligation to assign the patents to Innovatier.  *See Leavitt v. Leisure Sports Inc.*, 734 P.2d 1221, 1225 (Nev. 1987) ("It is . . . generally recognized that a corporate fiduciary cannot exploit an opportunity that belongs to the corporation."); *Gasser v. Infanti Int'l, Inc.*, 353 F. Supp. 2d 342 (E.D.N.Y. 2005) (recognizing that, under New York law, an officer "generally has a fiduciary duty to assign patents to that corporation" so as to not waste a corporate opportunity).  In this case, the evidence shows that Mr. Singleton was a founder of Innovatier and, at least as early as 2004, was Innovatier's President and COO.  Docket No. 228-1 at 7.  At least two of the Patent Applications were assigned to Innovatier.  Docket Nos. 201-13 through -15.  And Innovatier does not dispute that "Innovatier and/or Singleton" filed the Patent Applications.  Docket No. 201, Def.'s Mot. Summ. J. at 5 , ¶ 10; Docket No. 218, Pl.'s Opp'n at 7, ¶ 10.  For these reasons, the Court rejects Innovatier's arguments that it did not file the Patent Applications in its name.

Innovatier argues that extrinsic evidence is needed to interpret them, rendering summary judgment inappropriate. Docket No. 218, Pl.'s Opp'n at 9-10.

The License Agreement provides that Nevada law governs its construction. Docket No. 156-6, License Agreement at 16, § 15.1. Pursuant to the law of Nevada, "[w]hen a contract is clear, unambiguous, and complete, its terms must be given their plain meaning and the contract must be enforced as written; the court may not admit any other evidence of the parties' intent because the contract expresses their intent." *Ringle v. Bruton*, 86 P.3d 1032, 1039 (Nev. 2004); *see Sandy Valley Assocs. v. Sky Ranch Estates Owners Assoc.*, 35 P.3d 964, 953-54 (Nev. 2001) (citation omitted), *abrogated on other grounds by Horgan v. Felton*, 170 P.3d 982 (Nev. 2007). However, a "contract is ambiguous if it is reasonably susceptible to more than one interpretation." *Shelton v. Shelton*, 78 P.3d 507, 510 (Nev. 2003). If a contract is ambiguous, the Court should look beyond its express terms to the circumstances surrounding the parties' agreement and their subsequent conduct to determine their true and mutual intent. *Id*. Extraneous evidence, however, cannot be used to explain the meaning of a contract that is unambiguous on its face. *Kaldi v. Farmers Ins. Exch.*, 21 P.3d 16, 21 (Nev. 2001).

When facts are not in dispute, the interpretation of a contract is a question of law. *Shelton*, 78 P.3d at 510. The existence of an ambiguity is also a question of law. *Ins. Co. of N. Am. v. Hilton Hotels U.S.A., Inc.*, 908 F.Supp. 809, 814 (D. Nev. 1995) (citing *Margrave v. Dermody Prop.*, 878 P.2d 291, 293 (Nev. 1994)).

### 1.  RAMP Proprietary Technology

Before addressing the parties' interpretations of the term "RAMP Proprietary Technology," it is important to note that the term is used in both the license grant and Section 6.1 and, accordingly, should be interpreted consistent with both provisions. Thus, the technology that was licensed is the same that is protected in Section 6.1 against unauthorized patent filings by Innovatier.

The parties take two different approaches to construing "RAMP Proprietary Technology." CardXX asserts:

> The License Agreement defines CardXX's RAMP Proprietary Technology as follows:
>
> i) any and all rights in, to, or associated with a certain proprietary chemistry and related processes known as Reaction Assisted Molded Process (RAMP) (the "Proprietary Technology") or as more fully set forth and described in those certain United States Patent #5,955,021; #6,025,054; #6,256,873; #6,241,153; #726,884; and, #2,289,728, and ii) all know how and technical information possessed by CARDXX and related to the Proprietary Technology; and iii) all patent rights, copyrights, trademarks and other intellectual property rights which are related to the Proprietary Technology including, without limitation, that certain United States Trademark for the mark CARDXX.
> (License Agr't at 1.)

Docket No. 201, Def.'s Mot. Summ. J. at 4, ¶ 5. However, the term "RAMP Proprietary Technology" is not defined in the Agreement. The definition CardXX provides is the one for "CARDXX TECHNOLOGY." Thus, without explanation or analysis, CardXX summarily concludes that the meaning of "RAMP Proprietary Technology" is coterminous with the meaning of "CARDXX TECHNOLOGY." Using this definition, CardXX concludes that the "License Agreement defines CardXX's RAMP Technology

9

as expressly including CardXX's patents, as well as all know how and technical information related to the RAMP Technology [, *i.e*, the CardXX Patent Rights]." *Id*. at 3.[3]

Innovatier disagrees. To the extent the Court understands Innovatier's position, it posits two arguments: (1) the term "RAMP Proprietary Technology" is ambiguous because it is not defined and does not include the definition of "CARDXX TECHNOLOGY" and (2) to the extent the term "RAMP Proprietary Technology" can be construed, the term "means or relates to CardXX's confidential or trade secret information that was not publicly disclosed." Docket No. 218, Pl.'s Opp'n at 12-14. After noting that the term "RAMP Proprietary Technology" is not defined, but that the term "CARDXX TECHNOLOGY" is, Innovatier reasons as follows:

> The definition of RAMP Proprietary Technology [*i.e*., "the process that Licensee wishes to incorporate into the manufacturing of Financial Transaction Cards"] does not include or subsume the definition of CARDXX Technology, so it is reasonable to presume that the parties intended that these terms had different meanings. It is also reasonable to presume that because the definition of CardXX Technology includes various patents and other publicly disclosed documents, and RAMP Proprietary Technology does not, that RAMP Proprietary Technology means or relates to

---

[3] The License Agreement identifies by patent or application number only a subset of the CardXX Patent Rights in the definition of CARDXX TECHNOLOGY; it identifies neither the '537 Patent nor the '206 Application. Docket No. 156-6, License Agreement at 1. It appears CardXX contends they are, nevertheless, included because they constitute rights "associated with" or "related to" the technology described in the CardXX Patents. Docket No. 201, Def.'s Mot. Summ. J. at 8 ("The RAMP Technology, as defined in the License Agreement, specifically references the CardXX Patents that had issued at the time the License Agreement was executed in March 2005 as well as patent rights (such as yet to be filed patent applications) related to the RAMP Technology.") Innovatier does not dispute that the later acquired patent rights fall within the purview of CARDXX TECHNOLOGY. Thus, the Court will treat them as if they do.

>       CardXX's confidential or trade secret information that was
>       not publicly disclosed.

Docket No. 218, Pl.'s Opp'n at 12 (emphasis in original).  Stated simply, Innovatier contends "CARDXX TECHNOLOGY" and "RAMP Proprietary Technology" are mutually exclusive terms.  *See also id.* at 13 ("the definition of RAMP Proprietary Technology is different from and does not include the definition of CARDXX Technology").  As additional support, Innovatier looks to a single provision, Section 6.1, to infer an exclusion of publicly available or non-confidential information.  Docket No. 218, Pl.'s Opp'n at 10-12.  Section 6.1 is contained in an Article entitled "Confidentiality."  Innovatier posits, "[g]iven that Section 6.1 is clearly a prohibition against public disclosure of confidential information, it is reasonable to interpret this section only as merely precluding Innovatier from publicly disclosing CardXX's confidential information in a patent filing."  Docket No. 218, Pl.'s Opp'n at 11-12.

The Court is not persuaded by either party.  First, the Court notes that "RAMP Proprietary Technology" is an undefined term.  The sentence "RAMP Proprietary Technology means the process that Licensee wishes to incorporate into the manufacturing of Financial Transaction Cards" does not define the term "RAMP Proprietary Technology"; it simply explains that "RAMP Proprietary Technology" is the subject of the License Agreement.

Second, as the Nevada Supreme Court suggests, the contract itself should express the parties' intent.  *Ringle v. Bruton*, 86 P.3d 1032, 1039 (Nev. 2004).  In this case, the Agreement's opening recitals evidence the parties' intent.  The various "whereas" clauses are structured to explain that (a) Innovatier is in the business of

developing smart cards and tags, (b) CardXX has technology, *i.e.*, "CARDXX TECHNOLOGY," related to a specific manufacturing process, (c) Innovatier wants to incorporate CardXX's technology into the manufacturing process of its smart cards and tags, and (d) both CardXX and Innovatier desire to enter into a license agreement so that Innovatier may do so.  Docket No. 156-6 at 1-2.  *See Hilton Hotels v. Butch Lewis Prods., Inc.*, 808 P.2d 919, 228 n.1 (Nev. 1991) (noting that "whereas" clause indicated the intent of the parties).  It is clear from the opening paragraphs of the Agreement that the recital defining "CARDXX TECHNOLOGY" includes a description of the technology Innovatier is to license.  However, "CARDXX TECHNOLOGY" does not appear to be synonymous with the licensed technology, that is, the "RAMP Proprietary Technology." The definition of "CARDXX TECHNOLOGY" has three numbered components.  The first component includes the rights in and associated with "certain proprietary chemistry and related processes known as Reaction Assisted Molded Process (RAMP)" (the "Proprietary Technology"),[4] including the rights associated with the identified CardXX patents.  Docket No. 156-6 at 1.  The second component includes CardXX's "know how" related to the Proprietary Technology.  The third component includes all intellectual property rights related to the Proprietary Technology.[5]  The term "CARDXX TECHNOLOGY" is not used again in the Agreement after being defined in this way. The term "Proprietary Technology" is defined in the first component of the definition of

---

[4]  The Black's Law Dictionary defines "proprietary" as "Of, relating to, or holding as property."  BLACK'S LAW DICTIONARY 509 (Pocket ed. 1996).

[5]  Although, under the Court's interpretation, the scope of these three components appears to overlap, neither side has suggested an interpretation of the three components of "CARDXX TECHNOLOGY" which does not involve overlap.

"CARDXX TECHNOLOGY" as "certain proprietary chemistry and related processes known as Reaction Assisted Molded Process (RAMP)" and is referenced simply as "Proprietary Technology" in the subsequent two components. *Id*. Thus, while the Agreement does not explicitly define the term "RAMP Proprietary Technology," it is clear from the Agreement that the term refers to CardXX's "proprietary chemistry and related processes known as Reaction Assisted Molded Process (RAMP)," irrespective of whether they are protected by patents or trade secrets.

This reading of the term "RAMP Proprietary Technology" is consistent with the purpose of the Agreement, as well as the Agreement's other provisions. The primary purpose of the Agreement is to license CardXX's technology to Innovatier for the manufacture and sale of Financial Transaction Cards. It makes sense then that CardXX's RAMP proprietary chemistry and processes are that which "Licensee wishes to incorporate into the manufacturing of Financial Transaction Cards." *See id*. at 1. On the other hand, it is illogical to only license trade secrets and other confidential information, as Innovatier asserts, when the process it intends to use is covered by multiple public patents and applications. Additionally, Section 6.1 expressly concerns "challenge[s to] CARDXX's exclusive ownership" of the RAMP Proprietary Technology. Docket No. 156-6, License Agreement at 9, § 6.1. This is consistent with the meaning of "RAMP Proprietary Technology" as CardXX's proprietary chemistry and process.

Thus, while the License Agreement is not a model of draftsmanship, the Court does not find the term "RAMP Proprietary Technology" to be ambiguous. Innovatier has not demonstrated, as a matter of law, that the term is reasonably susceptible to more than one interpretation. The proper construction of RAMP Proprietary

Technology is CardXX's "proprietary chemistry and related processes known as Reaction Assisted Molded Process (RAMP)."

### 2. Section 6.1

Innovatier contends that Section 6.1 is ambiguous because CardXX's construction of "RAMP Proprietary Technology" renders Section 6.1 a restrictive covenant. Specifically, Innovatier states, "CardXX interprets Section 6.1 as a restrictive covenant that prohibits Innovatier from filing any patents 'relating to' any CardXX technology–even if invented solely by Innovatier." Docket No. 218, Pl.'s Opp'n at 13.

Innovatier misreads Section 6.1. This section clearly relates to "challenge[s to] CARDXX's exclusive ownership" of the RAMP Proprietary Technology and requires only that Innovatier obtain "prior express written consent" before filing patent applications relating to the technology. Docket No. 156-6, License Agreement at 9, § 6.1. It does not act as a bar to obtaining patent rights on its own inventions. Rather, as CardXX recognizes, "section 6.1 serve[s] as an important safeguard to prevent later disputes over ownership and inventorship relating to potential patent rights arising from the development of the RAMP Proprietary Technology under the Agreement." Docket No. 228, Def.'s Reply at 9. Because the Court finds that Section 6.1 is not ambiguous, it must enforce it as written. *Ringle v. Bruton*, 86 P.3d 1032, 1039 (Nev. 2004).

### 3. Breach of Section 6.1

As mentioned previously, it is undisputed that Innovatier filed Patent Applications related to the subject matter of the CardXX Patent Rights without CardXX's prior written consent. The only disputed issue concerns the meaning of "RAMP Proprietary

14

Technology." The Court has determined that the term means CardXX's proprietary RAMP chemistry and processes. Section 6.1 states that Innovatier "agrees that it shall not . . . file at any time in its name . . . for any patent . . . relating to RAMP Proprietary Technology without CardXX's prior express written consent of such filing." Docket No. 156-6, License Agreement at 9, § 6.1. The Court consequently finds that CardXX is entitled to summary judgment that Innovatier breached Section 6.1 of the License Agreement when it filed the Patent Applications.

### C. *Covenant of Good Faith and Fair Dealing*

The second counterclaim on which CardXX moves for summary judgment is its third counterclaim for breach of the License Agreement's implied covenant of good faith and fair dealing. Docket No. 201, Def.'s Mot. Summ. J.; Docket No. 235, Third Am. Countercl. at 11-12, ¶¶ 48-53.

Under Nevada law, "an implied covenant of good faith and fair dealing exists in *all* contracts." *A.C. Shaw Constr. v. Washoe County*, 784 P.2d 9, 10 (Nev. 1989) (emphasis in original). When "one party to the contract deliberately contravenes the intention and spirit of the contract, that party can incur liability for breach of the implied covenant of good faith and fair dealing." *Butch Lewis Prods.*, 808 P.2d at 922-23. A party's good faith is a question of fact. *Id*. at 923; *Shaw*, 784 P.2d at 11.

Neither party addresses this counterclaim directly. However, it appears that CardXX contends Innovatier breached the implied covenant when it: (1) began filing the Patent Applications shortly after entering into the License Agreement without obtaining CardXX's consent, (2) failed to withdraw or abandon the Patent Applications after

receiving notice from CardXX of the breach, and (3) continued to file Patent Applications without consent after receiving such notice.  Docket No. 201, Pl.'s Mot. Summ. J. at 9-11.  Innovatier responds that it believed the License Agreement prohibited only the filing of patent applications containing trade secret or confidential information.  Docket No. 218, Pl.'s Opp'n at 5-6.  Thus, Innovatier is presumably taking the position that it did not breach the Agreement in bad faith because, under its interpretation of the Agreement, it was not in breach.

While the Court has held that Innovatier's interpretation of the Agreement was not reasonable, this does not necessarily preclude Innovatier from having a good faith belief in that interpretation.  However, CardXX has submitted various private placement memoranda of Innovatier which reflect Innovatier's understanding that it had licensed CardXX's patents.  One memorandum provides:

> But with the development of CARDXX, Inc.'s (CARDXX) Reaction Assisted Molded Process proprietary technology (RAMP Technology), a new patented process has emerged.
> \*   \*   \*   \*   \*   \*
> [Innovatier] has negotiated an exclusive world wide license for the RAMP Technology as it relates to financial transaction devices.

Docket No. 228-1, Innovatier Private Placement Memo. at 7.  *See also* Docket No. 228-2, Aug. 1, 2007 Original Closing Docs at 5 ("[Innovatier] currently has licensed the rights to five U.S. and two international patents as it relates to the licensed technology.  CARDXX has one patent pending which [Innovatier] would have the right to use under its Licensing Agreement.").  This understanding is consistent with the deposition testimony of Mr. Lawrence Keim of Innovatier:

> A. To the best of my knowledge, we've never used the

>RAMP technology, as defined in the license agreement.
>
>Q. Okay. And you're basing that answer on the specific definition in the license agreement?
>
>A. Our understanding of the RAMP technology, which is defined in the license agreement.
>
>Q. And what is your understanding of that definition?
>
>A. That "RAMP technology" is defined as the patents that are listed in the license agreement and any improvements thereto by CardXX.

Docket No. 201-9, Keim. Dep. Tr. at 62:2-14. Thus, CardXX has submitted ample evidence that Innovatier did not have a good faith belief that it had licensed only trade secrets and confidential information. Because Section 6.1 is directed to the same technology that is licensed, namely the RAMP Proprietary Technology, this is also ample evidence that Innovatier did not have a good faith belief that Section 6.1 was directed only to trade secrets and confidential information.

In opposition, Innovatier submits a declaration of Mr. Keim, dated approximately six months after his deposition, and deposition testimony from multiple individuals that allegedly reflect varying and inconsistent interpretations of RAMP Proprietary Technology.

In his declaration, Mr. Keim attests that Innovatier interpreted Section 6.1 "as a prohibition on publicly disclosing information 'relating to' CardXX's trade secrets." Docket No. 218-2, Keim Decl. at 4-5, ¶¶ 15-16. The Court will not consider this declaration because it contradicts his prior deposition testimony that Innovatier understood the granted license to include CardXX's patents. *Burns v. Bd. of County Comm'rs of Jackson County*, 330 F.3d 1275, 1282 (10th Cir. 2003). It is clear from his

earlier deposition that Mr. Keim was represented by counsel who could have asked clarifying questions and Innovatier makes no claim that the newly-presented declaration is based on previously unavailable evidence. Thus, Mr. Keim's declaration is simply an "attempt to create a sham fact issue" on summary judgment. *Id*.

Equally unavailing are the many deposition excerpts Innovatier cites for the proposition that the parties have never agreed to the meaning of the term RAMP Proprietary Technology. Docket No. 218, Pl.'s Opp'n at 14-16. The Court will not address each of these excerpts individually. Suffice it to say that their relevance is marginal at best; they either are taken out of context, do not address the term as used in the License Agreement, or are in fact consistent with the Court's interpretation.

The Court, therefore, finds that no reasonable jury could conclude Innovatier had a good faith belief it licensed only trade secret and confidential information from CardXX. As a result, Innovatier has not demonstrated a triable issue of fact that it acted in good faith when it filed the Patent Applications. For this reason, summary judgment in favor of CardXX is appropriate.

## III.  CONCLUSION

For the foregoing reasons, the Court finds that RAMP Proprietary Technology is unambiguous. Accordingly, the Court finds Innovatier breached Section 6.1 of the License Agreement when it filed the Patent Applications. The Court also finds that Innovatier failed to raise a triable issue of fact that it acted in good faith when it breached the Agreement.

The Court notes that neither party addressed the relief that would be appropriate in the event of these breaches. The parties, therefore, shall file supplemental briefing

addressing the effect of this order on CardXX's damages and appropriate remedies.

Accordingly, it is

**ORDERED** that Defendant-Counterclaimant CardXX's Motion for Summary Judgment on the First and Second Counterclaims of the Second Amended Counterclaim and Jury Demand [Docket No. 201] is GRANTED.  It is further

**ORDERED** that the parties shall submit simultaneous supplemental briefs on the issue of relief by January 14, 2011.  The supplemental briefs shall be limited to the narrow issue of appropriate relief resulting from the Court's findings herein and shall not exceed 5 pages.

DATED December 27, 2010.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge